UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| SONNY DAVIS, | ) |
| Petitioner, | ) ) ) |
| v. | ) No. 2:19-cv-00005-JPH-MJD |
| RICHARD BROWN, | ) ) ) |
| Respondent. | ) |

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

Petitioner Sonny Davis was convicted in Indiana state court of burglary, robbery, aggravated battery, intimidation, criminal confinement, and criminal recklessness for beating his pregnant girlfriend in the head with a hammer and taking her truck keys.

Mr. Davis has filed a petition for a writ of habeas corpus alleging that trial and appellate counsel were ineffective and that he was denied due process on post-conviction review. For the reasons below, Mr. Davis's petition is **DENIED**.

**I. Background**

Petitioner's claims center on statements from his girlfriend, Christina Light, that were not presented at trial. This background section summarizes the trial evidence first before turning to the facts surrounding Ms. Light and then Mr. Davis's post-trial proceedings.

**A. The Trial Evidence**

On August 8, 2002, Ms. Light left her and Mr. Davis's apartment and drove to Barbara Heady's house. Phone records show that Mr. Davis called Barbara's house 30 times that afternoon. Per Ms. Light's request, Barbara told Mr. Davis that Ms. Light was not there. Trial Tr. 69−70.

1

Eventually, Mr. Davis called Barbara "a lying bitch" and threatened to come over and "beat the heck out of [her]." Trial Tr. 70. Spooked, Barbara asked Ms. Light to leave. Trial Tr. 71.

Ms. Light drove to Amy Heady's house with Amy and Amy's boyfriend, Kevin Milliner. Phone records show that Mr. Davis called Amy's house 10 times on August 8. Based on Ms. Light's instructions, Amy told Mr. Davis that Ms. Light was not there. Trial Tr. 162.

Shortly after Mr. Davis's tenth phone call to Amy's house, he showed up and started banging on the door. Trial Tr. 164. Mr. Milliner directed Ms. Light to hide under a bed. Trial Tr. 108. Amy tried to call police, but the phone lines had been cut outside. *Id.*; *see also* Tr. Exh. 1J. Mr. Milliner eventually opened the door "because regardless, he was going to come in." Trial Tr. 145.

Mr. Davis entered and searched for Ms. Light. Trial Tr. 164−66. When he found her, he dragged her from underneath the bed by her hair. Trial Tr. 111. He then hit her with a cordless drill he had found in the house. Trial Tr. 112. When she tried to scramble away, he pinned her down. Trial Tr. 114. Then he grabbed a hammer and repeatedly hit her in the head and face. *Id.*; Trial Tr. 168−69. As he hit her, Mr. Davis said, "I love you. Why are you doing this to me? Why are you cheating on me?" Trial Tr. 170; *see also* Trial Tr. 148 (Mr. Milliner testifying that Mr. Davis repeatedly told Ms. Light during the attack that he loved her). Mr. Davis also told Ms. Light, "If I go to prison, you're going to your grave." Trial Tr. 129−30.

After hitting Ms. Light with the hammer, Mr. Davis instructed Amy to fetch a knife from the kitchen. Trial Tr. 173. Amy brought the knife, and Mr. Davis used it to cut off some of Ms. Light's hair. Trial Tr. 174. Mr. Davis eventually got Ms. Light's truck keys from her pocket. Trial Tr. 175. Another man (who was never identified) arrived partway through the beating and left with the keys to fetch the truck. *Id.* Mr. Davis left shortly thereafter. Trial Tr. 176−77.

Ms. Light's injuries were "gruesome," Trial Tr. 150, but she remained conscious for a few minutes following the attack. When Officer Joseph Wells arrived on the scene, he saw Ms. Light stumbling on the front porch. Trial Tr. 30−31. Officer Wells quickly realized that "this wasn't a typical domestic." Trial Tr. 31. Ms. Light was "covered in blood," and Officer Wells asked her to sit down. *Id.* Knowing Ms. Light was seriously injured, Officer Wells "tr[ied] to get right to the point—what had occurred and who did it." Trial Tr. 32; *see also* Trial Tr. 39 ("I was trying to get more specific—exactly who it is and where they're at."). Ms. Light told him that "her ex-boyfriend, the father of her unborn child that she was carrying," committed the attack. Trial Tr 37. She began describing the attack, but she passed out while talking. Trial Tr. 38−39.

About the same time, paramedics arrived to provide treatment. Trial Tr. 39−40. They revived Ms. Light to consciousness, and she told a paramedic that her boyfriend had beaten her in the head with a hammer. Trial Tr. 59, 62.

Police arrested Mr. Davis, and Detective Matthew Reidenbach interviewed him on August 10, 2002. Trial Tr. 380. Mr. Davis initially denied having seen Ms. Light since 3:30 p.m. on August 8. Trial Tr. 381. But he later said, "I never meant to kill her, and . . . if I meant to kill her, I would have." Trial Tr. 385.

At trial, Mr. Davis testified that around 6:00 or 7:00 p.m. on August 8, Ms. Light found him in their apartment with a woman named "Toya." Trial Tr. 357. He did not know Toya's last name. *Id.* Ms. Light became upset and left, but later she repeatedly paged Mr. Davis because she needed money to pay off her drug-related debt to "some guy." Trial Tr. 360−61. Mr. Davis initially refused, but eventually he drove to check on Ms. Light at Amy's house. Trial Tr. 362. When he arrived, the front door was open and there was blood everywhere. Trial Tr. 363. Mr. Davis found Ms. Light in the bedroom with a swollen, bloody face. Trial Tr. 364. He asked what happened, but

she told him to leave and that "it was [his] fault." *Id.* Mr. Davis got her a towel and left. Trial Tr. 371. He did not call the police. *Id.* Nor did he describe this version of events when he was interviewed by Detective Reidenbach on August 10. *Id.*

The State introduced portions of a letter Mr. Davis had written to Ms. Light after his arrest. In the letters, Mr. Davis said, "You asked did I like hurting you and NO. I dont Im sorry I hope you can forgive me." Tr. Exh. 12A (original punctuation). Despite writing several such letters to Ms. Light, Mr. Davis never complained—or even noted—that she had falsely accused him. Trial Tr. 367.

The jury convicted Mr. Davis of burglary, robbery, aggravated battery, intimidation, criminal confinement, and criminal recklessness. Trial Tr. 426−28. The jury did not reach a verdict on the charge of attempted murder, and they acquitted Mr. Davis of battery against Amy. *Id.* The trial court found Mr. Davis to be an habitual offender and sentenced him to 50 years for aggravated battery and shorter concurrent sentences for the other offenses. Trial Tr. 478.

### B. Ms. Light's Statements Not Presented at Trial

On August 9, 2002, while Ms. Light was still confined to her hospital bed, she again identified Mr. Davis as her attacker. DA App'x 41.

On September 30, 2002, more than a month after Mr. Davis's arrest, Ms. Light signed a notarized letter stating that a man named "B-Dog" was the one who attacked her. PCR App'x 140. She explained that she had falsely identified Mr. Davis as her assailant because she was upset about catching him with another woman. PCR App'x 140−41. A shorter, non-notarized letter told a similar story. PCR App'x 143.

In October 2002, Ms. Light was ordered not to have contact with Barbara Heady, Amy Heady, or Mr. Milliner. DA App'x 123, 126.

On January 8, 2003, according to Barbara and her husband, William, Ms. Light repeatedly called their house upset that Amy and Mr. Milliner planned to appear for Mr. Davis's trial. DA App'x 118−19. Ms. Light also told Barbara that she would pay someone to kill Amy and Mr. Milliner. DA App'x 119. The trial court held Ms. Light in contempt and ordered her to be incarcerated for 16 days until Mr. Davis's trial was complete. DA App'x 127.

At trial, defense counsel attempted to call Ms. Light. *Davis v. State*, 2018 WL 3384858, at *1 (Ind. Ct. App. July 12, 2018). She was represented by counsel who expressed concerns about her competence and advised her to exercise her Fifth Amendment privilege. *Id.* The trial court told Ms. Light's counsel, "Why don't we let her hear what the questions are and then you can advise her." Trial Tr. 187.

Defense counsel asked Ms. Light a few questions, including "Who hit you with a hammer?" Trial Tr. 188. Ms. Light responded, "Some guy named Beedaw . . . that's his street name." *Id.* She explained that she first told people it was Mr. Davis because she "wanted to see him get locked up" because she had caught him cheating on her. *Id.*

Ms. Light's counsel intervened and again recommended that Ms. Light not testify. Trial Tr. 189. The trial court advised Ms. Light about the consequences of testifying, and Ms. Light invoked the Fifth Amendment. Trial Tr. 189−90.

Defense counsel then attempted to introduce Ms. Light's letters recanting her initial accusations against Mr. Davis. Trial Tr. 190−91. Ms. Light testified that the facts contained in the letters were true. Trial Tr. 192. She then again allowed her attorney to exercise the privilege on her behalf. Trial Tr. 193−97.

Later in the trial, defense counsel again sought to call Ms. Light. Trial Tr. 338−51. The State listed the potential charges against Ms. Light—including obstruction of justice, assisting a

criminal, and perjury—and noted that she faced "potential penalties up to maybe fifteen years." Trial Tr. 343−44. Ms. Light told the Court she wanted to testify. Trial Tr. 344.

Before the jury could return to the courtroom to hear Ms. Light's testimony, she interjected and asked to invoke the Fifth Amendment. Trial Tr. 345. Moments later, she reversed course again. *Id.* ("I'll go ahead and testify."). Then a police officer notified the court that Mr. Davis had been silently mouthing words to Ms. Light. *Id.* The court instructed a bailiff to stand directly in front of Mr. Davis, and Ms. Light once again invoked the Fifth Amendment. Trial Tr. 346−47.

Counsel sought to introduce Ms. Light's notarized letter, but it was excluded as hearsay. Trial Tr. 347−49. The court also denied defense counsel's motion to introduce a transcript of Ms. Light's testimony before she invoked the Fifth Amendment. Trial Tr. 349−51. Though the letters were not introduced, Mr. Davis testified on cross-examination that Ms. Light "sent you all a notarized letter . . . She did [tell] you all what happened. And she sent me a copy of what she said that she told—what she sent you all telling you all know that it was not me." Trial Tr. 368.

### C. Direct Appeal and Post-Conviction Review

On direct appeal, Mr. Davis argued that the trial court's jury instruction on the "breaking" element of burglary was erroneous. PCR Exh. B. The Indiana Court of Appeals affirmed, dkt. 10-1, and the Indiana Supreme Court denied leave to transfer, dkt. 10-2 at 3.

Mr. Davis next filed a state post-conviction petition arguing that

(1) trial and appellate counsel were ineffective for failing to argue that Mr. Davis was denied his right to confront Ms. Light;

(2) trial and appellate counsel were ineffective for failing to argue that the State and the trial court unlawfully prevented Ms. Light from testifying and coerced her to invoke the Fifth Amendment; and

(3) newly discovered eyewitness testimony showed that Mr. Davis's brother Johnny committed the crime.

PCR App'x 45−187.

The post-conviction trial court conducted multiple hearings with live testimony. James Denning—who was serving a 50-year sentence for attempted robbery at the time of the hearing—testified that he was present for the attack on Ms. Light and that Mr. Davis's brother Johnny was the attacker. Dkt. 12-2 at 23. Johnny then stole Ms. Light's truck and dropped Mr. Denning off at his home. *Id.* at 24. Mr. Denning never saw Johnny again, and he learned of the mistaken identity when he met Mr. Davis in prison. *Id.* at 24−25.

Tanisha Whiteside testified that she drove Johnny and Mr. Denning to a "white double" house "on the Southside somewhere." *Id.* at 42. Johnny and Mr. Denning entered the house together. *Id.* at 43. Ms. Whiteside did not go inside, and she drove away when she heard "yelling and talking" coming from the home. *Id.*

Amy Heady testified that a picture of Johnny looked like Mr. Davis. *Id.* at 34. She further testified that she testified truthfully at trial and that she had no reason to believe her trial testimony was inaccurate. *Id.* at 31−32. The court did not allow post-conviction counsel to ask Amy whether it was possible she mistook Johnny for Mr. Davis. *Id.* at 34−35.

Mr. Milliner testified that a picture of Johnny looked like Mr. Davis. *Id.* at 38. He further testified that the picture of Johnny looked like the person he remembered from "the incident." *Id.* The court did not allow post-conviction counsel to ask Mr. Milliner whether it was possible he mistook Johnny for Mr. Davis. *Id.* at 34−35.

The State introduced Mr. Davis's arrest report from August 10, 2002. PCR Exh. 1. The report showed that Mr. Davis provided Johnny's name, birth date, and social security number as his own before the arrest. *Id.*

After the evidentiary hearings, the trial court denied relief. PCR App'x 210−29. In doing so, the court expressly discredited Mr. Denning's testimony. PCR App'x 226.

The appellate court affirmed, *Davis v. State*, 2018 WL 3384858, *8 (July 12, 2018), and the Indiana Supreme Court denied leave to transfer, dkt. 10-9 at 7.

**D. Federal Habeas Review**

Mr. Davis filed a petition for a writ of habeas corpus in this Court purporting to raise 14 grounds for relief. Dkt. 1. The Court summarizes Mr. Davis's allegations as follows:

(1) trial and appellate counsel were ineffective for failing to argue that he was denied his right to confront Ms. Light;

(2) trial and appellate counsel were ineffective for failing to argue that the State and the trial court unlawfully prevented Ms. Light from testifying and coerced her to invoke the Fifth Amendment;

(3) trial and appellate counsel were ineffective for failing to challenge the exclusion of Ms. Light's letters to the prosecutor;

(4) trial counsel effectively abandoned him; and

(5) he was denied due process in his post-conviction proceedings.

## II. Applicable Law on Habeas Review

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). Where a state court has adjudicated the merits of a petitioner's claim, a federal court cannot grant habeas relief unless the state court's adjudication

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's

decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

"The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc). If the last reasoned state court decision did not adjudicate the merits of a claim, or if the adjudication was unreasonable under § 2254(d), federal habeas review of that claim is *de novo*. *Thomas v. Clements*, 789 F.3d 760, 766−68 (7th Cir. 2015).

Regardless of whether § 2254(d) applies, state court factual findings—including credibility determinations—are presumed correct. *Woolley v. Rednour*, 702 F.3d 411, 426−27 (2012). A petitioner may not rebut that presumption except with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III. Discussion

**A. Ineffective Assistance of Trial and Appellate Counsel**

The respondent argues that most of Mr. Davis's ineffective assistance arguments are procedurally defaulted because he failed to present them throughout one complete round of state-court review. Dkt. 10 at 14−19; *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

There is significant overlap between Mr. Davis's various ineffective assistance arguments, making it difficult to determine where one argument ends and another begins. And the respondent does not dispute that Mr. Davis fairly presented at least one argument regarding counsel's failure to argue a Confrontation Clause violation and another argument regarding counsel's failure to introduce Ms. Light's testimony. Dkt. 10 at 15−16. Accordingly, the Court will address the merits of these challenges to counsel's performance. *Cf. Washington v. Boughton*, 884 F.3d 692, 698 (7th Cir. 2018) (bypassing procedural issue to deny a claim on merits is "consistent with the interests

of comity, finality, federalism, and judicial efficiency that are at the heart of both the exhaustion requirement and the procedural default doctrine").

To obtain relief based on ineffective assistance of counsel, whether it be trial or direct appeal counsel, a petitioner must show (1) that counsel's performance "fell below an objective standard of reasonableness" and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

### 1. Admission of Ms. Light's Out-of-Court Statements

Mr. Davis argues that trial and appellate counsel were ineffective for failing to argue that admission of Ms. Light's out-of-court statements to first responders violated his right to confront witnesses against him. Dkt. 1 at 23−27.

The timing of Mr. Davis's direct appeal is crucial to this alleged failing. The Indiana Court of Appeals issued its decision on December 18, 2003. Dkt. 10-1. The leading Confrontation Clause case at the time was *Ohio v. Roberts*, 448 U.S. 56 (1980). On March 8, 2004—three days before the Indiana Supreme Court denied leave to transfer—the United States Supreme Court issued *Crawford v. Washington*, 541 U.S. 36 (2004), abrogating *Roberts*. Mr. Davis does not argue—and the Court does not find—that trial or appellate counsel was ineffective for failing to anticipate *Crawford*. Accordingly, Mr. Davis cannot rely on *Crawford* for his ineffective assistance arguments. *See Kirklin v. United States*, 883 F.3d 993, 996 (2018) ("Overruling precedent is serious and rare. It is not objectively unreasonable for a defense lawyer to assume that the Court will follow its precedents unless and until it signals clearly that it will not do so."); *cf. Bintz v. Bertrand*, 403 F.3d 859, 866 (7th Cir. 2005) ("[A] state court would not have acted unreasonably by failing to anticipate [*Crawford*] and applying *Roberts*.").

Before *Crawford*, Courts did not apply the Confrontation Clause to exclude an unavailable witness's statement against a criminal defendant so long as the statement fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66; *see also Crawford*, 541 U.S. at 40.

Ms. Light was unavailable based on her exercise of the Fifth Amendment privilege. *See Lee v. Illinois*, 476 U.S. 530, 549−50 (1986) (witness's exercise of Fifth Amendment privilege made him unavailable for Confrontation Clause purposes); *Bintz*, 403 F.3d at 867−69 (7th Cir. 2005) (same). And the Indiana Court of Appeals correctly found that Ms. Light's statements—both made within minutes of the attack—fit within the excited utterances hearsay exception. *Davis*, 2018 WL 3384858, at *6.

Because the Indiana Court of Appeals reasonably held that Mr. Davis's proposed Confrontation Clause argument would have failed, it also reasonably held that neither trial nor appellate counsel was ineffective for failing to make it. Section 2254(d) therefore bars habeas relief based on this complaint about counsel's performance.

### 2. Exclusion of Ms. Light's Testimony and Letters

Mr. Davis alleges that trial and appellate counsel were ineffective for failing to argue that (1) Ms. Light was unlawfully coerced into invoking the Fifth Amendment and (2) Ms. Light's letters to the prosecutor were unlawfully excluded from evidence.

Mr. Davis raises at least eight arguments for why counsel was deficient for failing to get Ms. Light's words before the jury. Because these claims can all be resolved on prejudice grounds, the Court need not address each allegation of ineffectiveness. *See Ward v. Neal*, 835 F.3d 698, 703 (7th Cir. 2016) ("[T]his is one of those cases that is easier to resolve on prejudice, and so we turn immediately to that point."). The Indiana Court of Appeals did not reach prejudice, so this Court reviews the question *de novo*. *Blackmon v. Williams*, 823 F.3d 1088, 1105 (7th Cir. 2015).

11

The evidence against Mr. Davis, including the following, was overwhelming:

- phone records showing that Mr. Davis made more than 30 calls to Barbara Heady's house and another 10 to Amy Heady's house on the day of the attack;

- Barbara's testimony that Mr. Davis called her "a lying bitch" and threatened to come "beat the heck out of [her]" when she told him that Ms. Light was not at her house;

- Amy's testimony that Mr. Davis arrived at her house within minutes of his last phone call and that the phone lines were cut when Amy tried to call police after he arrived;

- Amy's detailed account of the attack, including when Mr. Davis cut Ms. Light's hair and told her, "I love you. Why are you doing this to me? Why are you cheating on me?" as he beat her in the face with a hammer;

- Mr. Milliner's corroborating eyewitness account;

- Ms. Light's statements to first responders identifying her boyfriend and the father of her unborn child as the attacker;

- Mr. Davis's alibi testimony, which was facially implausible, inconsistent with the phone records, and inconsistent with his statement to police two days after the attack;[1]

- Mr. Davis's statement to police: "I never meant to kill her, and . . . if I meant to kill her, I would have."

At best for Mr. Davis, Ms. Light would have testified consistent with her letter and his trial testimony. Her letter states that Mr. Davis is innocent and that a man with a street name of "B-Dog" attacked her. PCR App'x 140. Amy and Mr. Milliner arrived later and did not witness the attack, but Ms. Light told them to lie and say they saw Mr. Davis beat her. *Id.* Ms. Light was angry at Mr. Davis for dating another woman, so she wanted his parole to be revoked. *Id.* at 140−41.

---

[1] Mr. Davis testified that Ms. Light left his apartment after finding him with a woman named "Toya" around 6:00 or 7:00 p.m. on August 8. Trial Tr. 357. Later that night, he drove to Amy's house and found Ms. Light covered with blood, so he gave her a towel and then left. Trial Tr. 362−71. But he told Detective Reidenbach on August 10 that he had not seen Amy since 3:30 p.m. on August 8. Trial Tr. 381. And the phone calls from Mr. Davis's residence to Barbara Heady's began at 2:15 p.m. Trial Exh. 6D; *see also* Trial Tr. 74 (Barbara Heady testifying that Ms. Light was at Barbara's home "all afternoon—and practically all day").

12

Had Ms. Light testified, she would have been impeached by her August 9 identification of Mr. Davis and her threat to hire someone to kill Amy and Mr. Milliner. DA App'x 41, 119. The State also would have introduced evidence of a jail phone call between Mr. Davis and Ms. Light in which Mr. Davis told Ms. Light, "you f'd up my alibi by sending those letters." Trial Tr. 315; *see also* Trial Tr. 319−20 (State could not introduce recording until defense presented evidence regarding identity). And the State doubtless would have emphasized Mr. Davis's threat to Ms. Light: "If I go to prison, you're going to your grave." Trial Tr. 129−30.

Given the overwhelming evidence against Mr. Davis, including Ms. Light's own identification just minutes after he had beaten her in the head with a hammer, there is no reasonable probability that her proposed testimony would have led to acquittal. Accordingly, trial and appellate counsel were not ineffective for failing to successfully argue for its admission.

**B. Effective Denial of Counsel**

Mr. Davis argues that he was "completely deprived" of counsel. Dkt. 1 at 29−33; *see also Cronic v. United States*, 466 U.S. 648, 659 (1984).

Where counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing,'" prejudice from counsel's deficient performance is presumed. *Smith v. Brown*, 764 F.3d 790, 796 (7th Cir. 2014) (quoting *Cronic*, 466 U.S. at 659). Mr. Davis lists a series of complaints about counsel's performance, but he ignores the work that trial counsel did—cross-examining every State witness, repeatedly arguing that Ms. Light's testimony and letters should be admitted, and successfully moving to exclude inculpatory evidence. Indeed, trial counsel obtained a directed verdict on the charge of interference with reporting a crime, Trial Tr. 328−29, an acquittal on one of the battery charges, Trial Tr. 428, and no verdict on attempted murder, Trial Tr. 426−27. In short, counsel did not fail to subject the prosecution's case to meaningful adversarial testing.

13

**C. Due Process on Post-Conviction Review**

Mr. Davis alleges that he was denied due process in the trial court on post-conviction review. Dkt. 1 at 42−43. But he failed to make this due process argument in his appellate brief or his petition to transfer. *See* dkt. 10-4 (post-conviction appeal brief, arguing only that trial court abused its discretion); dkt. 10-8 (post-conviction petition to transfer, not arguing abuse of discretion or due process violation). This claim is therefore defaulted. *Boerckel*, 526 U.S. at 845.

A petitioner cannot obtain relief on a procedurally defaulted claim without showing either "cause and prejudice" to excuse the default or "that the court's failure to consider the defaulted claim would result in a fundamental miscarriage of justice." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013).

Mr. Davis argues that he is actually innocent, so failure to consider the defaulted claim would result in a fundamental miscarriage of justice. Dkt. 15 at 102−06. "A claim of actual innocence must be both credible and founded on new evidence." *Arnold v. Dittmann*, 901 F.3d 830, 836 (7th Cir. 2018); *see also Schlup v. Delo*, 513 U.S. 298, 324 (1995). A petitioner must "show that, in light of this new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Arnold*, 901 F.3d at 837. This is a high bar, and Mr. Davis's allegations fall well short.

The alleged new evidence is Ms. Light's proposed testimony, Mr. Denning's and Ms. Whiteside's post-conviction testimony, and the post-conviction testimony that Amy and Mr. Milliner were not allowed to give.

The post-conviction trial court expressly discredited Mr. Denning's testimony, PCR App'x 226, and Mr. Davis offers no reason to find the state court's credibility determination clearly erroneous. Moreover, Mr. Davis's proposed exculpatory witnesses do not share a consistent

account. Ms. Light's letter says that Mr. Milliner and Amy were not present for the attack. PCR App'x 140, but Mr. Davis says Mr. Milliner would testify that he saw Johnny Davis commit the crime, dkt. 1 at 43 ("Kevin Milliner would have identified Davis's brother from the tattoo that is on his face as the perpetrator."). And Mr. Denning testified that he stayed in the car with Ms. Whiteside while Johnny Davis entered Amy's house alone, dkt. 12-2 at 22, but Ms. Whiteside testified that Mr. Denning and Johnny entered Amy's house together, *id.* at 43.

Even the alternative suspect has shifted over time. Mr. Davis's trial testimony and Ms. Light's letters point to a drug dealer known to Ms. Light only as "B-Dog." PCR App'x 140; Trial Tr. 360−61. But now Mr. Davis alleges that his brother Johnny was the attacker. Dkt. 1 at 43; dkt. 12-2 at 23; dkt. 12-2 at 41. Despite ample opportunity, Mr. Davis has presented no evidence that his brother Johnny is "B-Dog." And he has presented no explanation for why his brother or "B-Dog" would have told Ms. Light, "I love you. Why are you doing this to me? Why are you cheating on me?" as he beat her in the face with a hammer. Trial Tr. 170.

In the face of the overwhelming evidence presented at trial, Mr. Davis has not alleged new evidence such that no reasonable juror would have found him guilty beyond a reasonable doubt. Accordingly, his claim of actual innocence does not excuse his procedural default.

### IV. Motion for Evidentiary Hearing

After filing his petition, Mr. Davis moved for an evidentiary hearing seeking to show that (1) the State threatened and intimidated Ms. Light to prevent her from testifying and (2) he is actually innocent.

Evidentiary hearings are not granted as a matter of right. Absent unusual circumstances not present here, a petitioner seeking an evidentiary hearing must demonstrate diligent pursuit of the relevant evidence in state court. *Avila v. Richardson*, 751 F.3d 534, 537 (7th Cir. 2014) (citing

28 U.S.C. § 2254(e)(2) and *Williams v. Taylor*, 529 U.S. 420, 432 (2000)). A petitioner bears the burden of showing diligence. *Owens v. Frank*, 394 F.3d 490, 500 (7th Cir. 2005).

Mr. Davis's state post-conviction proceedings took more than 11 years. PCR App'x 11−30. He communicated with Ms. Light after his conviction, and she allegedly told him that Johnny was the attacker. Dkt. 12-2 at 54. Nevertheless, Mr. Davis did not present an affidavit from Ms. Light asserting that she was intimidated or threatened. Indeed, he still has not presented such an affidavit. Given his access to Ms. Light and the time that has elapsed, Mr. Davis cannot show that he diligently pursued the evidence he seeks to present.

Mr. Davis also is not entitled to a hearing on actual innocence. As discussed in Section III(C), even if Mr. Milliner and Amy testified as he says they would, Mr. Davis would not satisfy the "no reasonable juror" standard. *Arnold*, 901 F.3d at 837.

Mr. Davis's motion for an evidentiary hearing, dkt. [16], is therefore **DENIED**.

### V. Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Instead, a state prisoner must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a claim is resolved on procedural grounds (such as default), a certificate of appealability should issue only if reasonable jurists could disagree about the merits of the underlying constitutional claim *and* about whether the procedural ruling was correct. *Flores-Ramirez v. Foster*, 811 F.3d 861, 865 (7th Cir. 2016) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Here, no reasonable jurist could disagree that Mr. Davis's claims are defaulted, barred by 28 U.S.C. § 2254(d), or otherwise without merit. A certificate of appealability is therefore denied.

## VI. Conclusion

Mr. Davis's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**. His motion for an evidentiary hearing, dkt. [16] is **DENIED**. A certificate of appealability shall not issue. Final judgment in accordance with this decision shall issue.

**SO ORDERED.**

Date: 3/27/2020

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

SONNY DAVIS
128888
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Justin F. Roebel
INDIANA ATTORNEY GENERAL
justin.roebel@atg.in.gov